[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION AS TO THE COMBINED AND/OR CONSOLIDATED CASES OFSHAWMUT BANK CONNECTICUT, N.A., F/K/A THE CONNECTICUT NATIONAL BANK v. L RREALTY, ET AL AND L R REALTY, ET AL v. SHAWMUT BANK CONNECTICUT, N.A.,
CT Page 6027F/K/A THE CONNECTICUT NATIONAL BANK
THE FORECLOSURE ACTION
This suit was initiated by writ, summons and complaint dated February 24, 1992, and returnable March 17, 1992, seeking to foreclose a certain mortgage and note dated June 30, 1989, in the amount of $500,000.00, given and guaranteed by the defendants concerning certain real estate known as 100-104 Old Hartford Road, Colchester, Connecticut.
The complaint claimed a foreclosure of the mortgage, immediate possession, a deficiency judgment, equitable relief, attorneys fees and money damages.
The writ was returnable at Hartford.
On or about March 20, 1992, the defendants appeared by counsel. On April 27, 1992, the suit was transfered to the Judicial District of New London, mindful that the real estate sought to be foreclosed was situated in New London County.
On July 17, 1992, an Amended complaint was filed by the plaintiff Bank seeking substantially the same relief as in the original writ.
On October 6, 1992, defendants' counsel filed a Motion to Consolidate the within foreclosure action with another suit entitled L R Realty, et al v. The Connecticut National Bank, Docket No. CV92-0522814, which was granted by the court, Teller, J., on November 23, 1992.
On October 23, 1992, the defendants' filed an Answer to the Complaint (Amended Complaint) with six special defenses.
At the same time the defendants' filed a Counterclaim and Set Off, October 23, 1992, containing eight counts and claimed compensation damages, punitive damages, attorneys fees and other appropriate relief.
On January 6, 1993, the court, O'Connell, J., granted plaintiff's Motion to Strike as to defendants' first, third and fourth special defenses. The court also granted the CT Page 6028 Motion to Strike as to count eight of the defendants' counterclaim.
On March 29, 1993, new counsel appeared for the plaintiff Bank. On July 30, 1993, defendants' filed an Amended Answer with Special Defenses and Counterclaim and Set Off.
On August 31, 1993, the plaintiff filed a Reply to Special Defenses an Answer to the Counterclaim and a Special Defense as to Count One.
On September 13, 1993, the defendants' filed as Reply to the Plaintiff's Special Defense.
On August 29, 1994, the court, Hurley, J., reinstated Count Eight of Defendants' Counterclaim which sounds in a violation of the Connecticut Unfair Trade Practices Act.
On September 13, 1994, the Defendants' filed a Second Amended Counterclaim and Set Off.
On September 30, 1994, the plaintiff filed a Reply to Special Defenses and Answer to the Second Amended Counterclaim.
Action No. CV-92-0523134 — This is an action by Shawmut Bank Connecticut, N.A., formerly known as The Connecticut National Bank (Shawmut) (i) to foreclose a first mortgage (the Shawmut mortgage) on certain property in Colchester, Connecticut (the Colchester property) given by defendant LR Realty, a Connecticut partnership (LR) to secure repayment of a $500,000 loan under the terms of a commercial promissory note that matured on December 31, 1991 (the note), (ii) to recover the costs of collecting the debt due under the note, all as provided in the note, and (iii) to recover any deficiency between the amount owed to Shawmut and the value of the Colchester property from Raymond LeFoll (LeFoll) and his wife Gail LeFoll who delivered guarantees (the guarantees) personally guaranteeing LR's performance under the note (LR, LeFoll and his wife are hereinafter sometimes referred to collectively as "the LeFoll parties").
In their Amended Answer to Shawmut's Complaint in this Action, the LeFoll parties allege that, prior to and contemporaneously with the execution and delivery of the note, CT Page 6029 the Shawmut mortgage and the guarantees, Shawmut entered into an oral agreement with LeFoll by which Shawmut agreed to subordinate the Shawmut mortgage unconditionally to any construction/permanent mortgage in favor of any institutional lender if and when LeFoll might request Shawmut to subordinate to such a mortgage. Based on the premise that Shawmut's rights under the note and the Shawmut mortgage were subject to an enforceable agreement to unconditionally subordinate, the LeFoll parties' Amended Answer (the LR answer) alleges defenses of alteration of contract, equitable estoppel and unclean hands, and includes counterclaims for breach of contract, promissory estoppel, breach of obligations of good faith and fair dealing, economic duress, interference with contractual relations, and violation of the Connecticut Unfair Trade Practices Act (CUTPA). In addition, the LR complaint and the LR answer allege claims that LeFoll was fraudulently induced to agree to a March 25, 1991 mortgage commitment agreement with Mechanics Savings Bank (Mechanics) by an October 26th letter in which Shawmut had stated its understanding of the conditions under which it was prepared to subordinate the Shawmut mortgage (a letter that LeFoll had countersigned in such a way that the Shawmut officers with whom LeFoll was dealing could reasonably have thought that LeFoll was agreeing with the terms expressed in that letter).
Shawmut's reply denied all of the material allegations of these counterclaims.
THE LENDER LIABILITY ACTION
This suit was initiated by writ summons and complaint dated April 23, 1992, and returnable May 26, 1992, seeking damages allegedly for the defendant Bank's refusal to subordinate its outstanding mortgage to a new construction mortgage, for breach of contractual duty and bad faith, for thwarting, preventing and interfering with plaintiffs' ability to obtain a first construction mortgage, for unlawful economic duress and coersion, for interfering with a protected relationship, for engaging in unfair or deceptive acts or practices in the conduct of defendant's business, as it affected the plaintiff, for violating Section 42-110b of the Connecticut General Statutes, and injuring the plaintiff thereby.
The complaint claimed compensation damages, punitive CT Page 6030 damages, attorney's fees and injunctive relief.
The defendant appeared by counsel on May 28, 1992. The plaintiff filed a Revised Complaint on September 29, 1992, making the same claims in its prayer for relief except for injunctive relief.
The motion for consolidation filed October 23, 1992, with The Connecticut National Bank vs. L R Realty, et al, Docket No. CV92-523134S was granted by the court, Teller, J., on November 23, 1992.
On November 12, 1992, the defendant Bank filed a Motion to Strike. On March 24, 1993, the court, Hurley, J., issued a Memorandum of Decision denying the Bank's Motion to Strike the Plaintiffs' Second Count, granted the Bank's Motion to Strike Count Seven, denied the Bank's Motion to Strike Count Eight and granted the Bank's Motion to Strike the Plaintiffs' Claim for Punitive Damages as to Count Three.
On April 8, 1993, plaintiffs' filed an Amended Complaint. As to counts four and six of the original complaint, these had been stricken by agreement as were the claims for attorney's fees as to counts three, four, five, six and seven.
The defendant Bank, on April 16, 1993, filed an Objection to the Request for Leave to Amend Plaintiffs' Complaint which was granted by the court, Hurley, J., as to counts five, six and seven of the Amended Complaint on April 7, 1993. See Articulation by Hurley, J., filed June 29, 1993, as to reaffirmation of the courts earlier memorandum of decision dated March 24, 1993.
On August 11, 1993, the plaintiffs' filed an Amended Complaint consisting of five counts.
On August 31, 1993, the defendant Bank filed an Answer to the Amended Complaint and a First Special Defense to Count One.
On September 13, 1993, the plaintiffs' filed a Reply to the Special Defense.
Action No. Cv-92-0522814 S — This is an action by the LeFoll parties for damages that they claim to have been caused CT Page 6031 by Shawmut's failure to unconditionally subordinate the Shawmut mortgage to a construction/permanent mortgage in favor of Mechanics. The complaint in this action (the LR complaint) basically tracks the counterclaims that are included in the LeFoll Parties' Amended Answer in Shawmut's foreclosure action. Shawmut's answer denied all of the material allegations of the LeFoll parties' complaint.
The court makes the following findings of fact.
Shawmut Bank Connecticut, N.A. ("Shawmut") is a National banking association engaged in the banking business in Connecticut. For the purposes of these actions, the parties have agreed that Shawmut may be treated for all purposes as the successor in interest to The Connecticut National Bank.
Raymond G. LeFoll ("LeFoll") is an attorney-at-law admitted to practice in the State of Connecticut since approximately 1969. For approximately 26 years, LeFoll has engaged in the general practice of law, but over the years his practice has concentrated in the particular area of real estate. In addition, beginning in 1970, LeFoll engaged in the real estate development business, and by 1988 he had substantial experience and expertise in that business. At trial LeFoll admitted that, as a lawyer, he has learned to try to pay attention to detail.
Raymond G. LeFoll (LeFoll) engages in the practice of law at 2301 Silas Deane Highway, Rocky Hill. LeFoll's daughter practices with him. LeFoll graduated from Wethersfield High School in 1958, received an engineering degree from Boston University in 1962, a master's degree in engineering from Rensaelaer Polytechnic Institute in 1963 and a juris doctor degree from the University of Connecticut School of Law in 1969.
LeFoll has represented a wide spectrum of clients. LeFoll owns a number of commercial properties on Silas Deane Highway in Rocky Hill, all occupied by tenants.
LeFoll owns several units in an East Granby condominium development originally of sixteen units. LeFoll purchased two building lots in Saint Maartens in 1987. In 1988, LeFoll built a villa on one of the Saint Maartens' lots worth $400,000. There was no mortgage on this residence. CT Page 6032
In 1988, LeFoll built a second residence in Saint Maartens which was finished in 1990 at a cost of $450,000. Some of LeFoll's early financing dealings were with Cromwell Savings Bank and Farmers and Mechanics Bank.
LeFoll first met Fritz Wamester, a loan officer of the Bank, in 1985 through a representative of Connecticut National Bank named Nowicki. LeFoll arranged for a number of loans through Wamester. LeFoll first became interested in a certain parcel of land in Colchester in November of 1988.
L R Realty ("LR") is a Connecticut general partnership, originally formed by LeFoll and Curtis Roggi to develop real estate in the State of Connecticut. In or about September 1989, Mr. Roggi withdrew as a partner of LR, and LeFoll's wife, Gail Lefoll ("GLeFoll"), became a partner in his stead. LR, LeFoll and GLeFoll are hereinafter sometimes referred to collectively as "the LeFoll Parties".
On June 30, 1989, Shawmut loaned LR $500,000 in connection with the purchase by LR of approximately 3 acres ("the Colchester Property") in Colchester, Connecticut. Three hundred ten thousand dollars of that loan was applied directly to the purchase price paid by LR for the Colchester Property, approximately $21,000 of the loan was applied to brokers' commissions, and the balance was applied by LR to the initial development of the Colchester Property.
At the June 30, 1989 Closing ("the Closing") at which Shawmut loaned $500,000 to LR, to evidence and secure the loan, LR delivered to Shawmut:
 (a) A Commercial Promissory Note in the principal amount of $500,000 ("the Note"). The Note provided by its terms that the obligor (LR) was to pay interest only, and, although the Note states on its face that principal was payable on demand, attached to it was an addendum indicating that the principal was to be paid no later than December 31, 1991. The Note in form is not a skeletal promise to repay moneys loaned, and does not serve merely as evidence of LR's obligation to repay $500,000 to Shawmut. The Note also contains a detailed recitation of the terms and conditions relating to CT Page 6033 repayment, defined the circumstances constituting a default, described Shawmut's remedies in the event of a default, and expressly provided that, in the event of a default, Shawmut would become entitled to recover the costs incurred to enforce collection.
 (b) A Guaranty Agreement ("the Guaranty") by which LeFoll and Mr. Roggi, personally guaranteed payment of the Note. In September, 1989, when Mr. Roggi withdrew from LR, and GLeFoll delivered her personal guaranty of the Note to Shawmut, Shawmut released Mr. Roggi from the Guaranty.
 (c) A Mortgage ("the Shawmut Mortgage") by which LR created a first mortgage lien in the Colchester Property in favor of Shawmut to secure due performance of LR's obligations under the Note. The Shawmut Mortgage in form is not a skeletal document. It contains a detailed recitation of the rights and interests of Shawmut as mortgagee, and very clearly defines the priority of the lien intended to be created by the instrument.
 (d) A Collateral Assignment of Rents and a Security Agreement by which LR provided Shawmut with further security for the performance of LR's obligations due under the Note.
There is nothing in either the Note, the Shawmut Mortgage, or any of the other security documents delivered by LR and LeFoll at the Closing, suggesting that these documents, taken together, were not intended to constitute the complete and final expression of the parties' intention concerning the nature, priority and duration of the lien that LR was providing to Shawmut to secure repayment of the $500,000 loan. Together, these documents constituted an integrated agreement concerning the nature, priority and duration of the lien created by the Shawmut Mortgage.
None of the documents signed and exchanged by the parties at the Closing mentioned or referenced any agreement by Shawmut to subordinate the Shawmut Mortgage to any mortgage that LR might thereafter want to place on the Colchester Property to secure any future construction, permanent or other CT Page 6034 loan by a lender to LR.
At the June 30, 1989 Closing, an attorney, James Ripper ("Ripper") delivered to the Bank an opinion letter ("the Ripper Opinion") in which Ripper stated, inter alia, that he had examined the Note and the Shawmut Mortgage, and in his opinion the Note and the Shawmut Mortgage constituted "legal, valid and binding obligations enforceable against" LR and LeFoll in accordance with their respective terms, excepting only "to the extent that their enforceability may hereafter be limited by bankruptcy or insolvency or other laws affecting creditor's rights generally."
Although the Ripper Opinion states in two places that Ripper was acting as attorney for "the Borrower", at Trial Ripper testified that he was acting as attorney for both LR and Shawmut. In any event, when he delivered the Ripper Opinion, Ripper understood that it was something Shawmut might well be relying on.
At trial, Ripper testified that, by opining that the Note was valid and enforceable in accordance with its terms, he meant that if LR did not pay interest on the date that interest was due and within any grace period stated in the Note, Shawmut might bring an appropriate action to recover on the Note and would prevail. He further testified that, by opining that the Shawmut Mortgage was valid and enforceable in accordance with its terms he meant that if LR did not pay interest under the Note when due and within any grace period stated in the Note, Shawmut might bring an appropriate action to foreclose the Shawmut Mortgage in the appropriate Court of the State of Connecticut and would prevail.
In connection with the Closing, Ripper's law firm, as agents for Connecticut Attorneys' Title Insurance Co., issued a title policy insuring Shawmut against certain losses that might result under certain circumstances in the event that Shawmut were required to foreclose under the Shawmut Mortgage.
The conclusion that the agreements signed and delivered at the Closing constituted an integrated agreement concerning the nature, priority and duration of the lien created by the Shawmut Mortgage is reinforced by the Ripper Opinion which treated those agreements as though they were intended to constitute the complete and final expression of the parties' CT Page 6035 intention concerning the nature, priority and duration of the lien that LR was providing to Shawmut to secure repayment of the $500,000 loan. Although Ripper's file contained a "Post-it" notation indicating that there had been some mention made of the possibility of a future subordination of the Shawmut Mortgage, the Ripper Opinion did not mention any agreement on the part of Shawmut to subordinate the Shawmut Mortgage to a future construction and/or permanent mortgage on the Colchester Property, and did not say anything to suggest that LR's obligation to pay interest or principal due under the Note, or the right of Shawmut to foreclose under the Shawmut Mortgage in the event of any default under the Note, was subject to or dependent upon Shawmut's performance of any oral agreement concerning subordination of the Shawmut Mortgage. Furthermore, Ripper's testimony established (i) that he had been unaware of any enforceable agreement between Shawmut and LeFoll obligating Shawmut to subordinate the Shawmut Mortgage to a future construction mortgage, (ii) that if any such agreement to subordinate the Shawmut Mortgage had existed, the Shawmut Mortgage deed would have been written differently, and (iii) that if he had thought that any such agreement to subordinate the Shawmut Mortgage had existed, he would not have given the opinion he gave that the Shawmut Mortgage was valid and enforceable in accordance with its terms.
Not only was there no mention of any oral agreement to subordinate the Shawmut Mortgage in any document delivered at the June 30, 1989 Closing, but Francis Wamester ("Wamester"), the officer of Shawmut with whom LeFoll had dealt, made no mention of any such agreement in the memorandum that he prepared for Shawmut's files approximately one week after the Closing. That memorandum, by which Wamester fulfilled his responsibility by briefly noting and memorializing the material terms of the loan, contains nothing to suggest the existence of any agreement to subordinate the Shawmut Mortgage, and cannot reasonably be read to put any of Wamester's superiors or any bank regulator on notice that enforcement of the Note and Shawmut Mortgage were in any way conditioned upon Shawmut's performance of any such agreement.
It is to be noted that on December 30, 1989, Wamester prepared another memorandum describing the material terms of the loan transaction for Shawmut's files, and in that memorandum he again failed to mention any oral agreement to subordinate the Shawmut Mortgage. CT Page 6036
The action in which Shawmut is plaintiff (No. CV-92-0523134S) is an action to foreclose the Shawmut Mortgage.
In the action in which LR is plaintiff (No. CV-92-0522814S), LR claims compensatory and punitive damages on a number of theories: (i) breach of an alleged contract to subordinate the Shawmut Mortgage, (ii) promissory estoppel precluding Shawmut from refusing to subordinate the Shawmut Mortgage, (iii) breach of obligations of good faith and fair dealing with respect to subordination of the Shawmut Mortgage, (iv) fraud inducing LR to enter into the loan in the first place, (v) wrongful interference by Shawmut with LR's relationship with a prospective construction mortgage lender, (vi) economic duress, and (vii) engagement in unfair and deceptive practices in violation of the Connecticut Unfair Trade Practices Act.
As special defenses to Shawmut's action to foreclose the Shawmut Mortgage in No. CV-92-0523134S, the Amended Answer of the LeFoll Parties (the "LR Answer"), alleges that a legally enforceable oral agreement by Shawmut to subordinate the first lien of the Shawmut Mortgage to the first lien of any "construction mortgage" that LR might subsequently give to any institutional lender that might ultimately lend LR whatever funds LR might need to complete construction of improvements on the Colchester Property was "[p]art of the mortgage note and mortgage deed transaction on June 30, 1989." In the Amended Complaint in a separate count (No. CV-92-0522814S) (the "LR Complaint"), LR has also alleged the same oral agreement to subordinate as the basis of claims against Shawmut for approximately $1.3 million in damages.
Both the LR Answer and the LR Complaint explicitly specify that the agreement to subordinate the Shawmut Mortgage, allegedly breached by Shawmut, was the "culmination" of oral "representations" that Wamester allegedly made to LeFoll (i) in December 1988, approximately seven months before LeFoll first entered into any legally binding obligations to Shawmut with respect to the $500,000 loan, and (ii) at the June 30, 1989 Closing at which LeFoll signed and delivered the Note and Shawmut Mortgage, and Shawmut advanced the proceeds of the $500,000 loan.
LeFoll testified that he did not think the oral CT Page 6037 representations allegedly made by Wamester in December 1988 alone resulted in an enforceable agreement obligating Shawmut to subordinate the Shawmut Mortgage it ultimately received in June 1989, but that the agreement to subordinate upon which his claims are based became enforceable when, on June 30, 1989, he borrowed the $500,000 from Shawmut and signed and delivered the Note and Shawmut Mortgage.
LeFoll testified that he would not have signed the mortgage documents at the June 1989 Closing "without the unconditional subordination agreement." However, as already stated, when he signed and delivered the Note and Shawmut Mortgage, LeFoll did not have any document (much less a document signed by Shawmut) referring to any of the representations concerning subordination supposedly made by Wamester, or referring to a subordination of the Shawmut Mortgage to any other lien under any circumstances of any kind.
LeFoll also testified (i) that he would advise a client to obtain written confirmation of any such agreement to subordinate a $500,000 mortgage before signing such a mortgage, (ii) that, given the choice, he would also want a written confirmation of any such agreement upon which he might be relying, (iii) that when he was preparing to sign the Note, Shawmut Mortgage and personal guaranty putting all of his assets at risk for payment of the Note, he noticed that there was no reference in any document delivered at the Closing to the oral agreement to subordinate the Shawmut Mortgage upon which he claimed to be relying, and (iv) that he expressly told Wamester that the substance of the alleged oral agreement need not be memorialized by any writing delivered at the Closing.
Wamester, who left the employ of Shawmut in the early Fall of 1990, testified at trial that in December 1988 he made a representation to LeFoll concerning the possibility of subordinating to a future construction loan the first mortgage that Shawmut would require from LeFoll as security for any loan that Shawmut might make to LeFoll (or to LR) to purchase the Colchester Property.
Francis (Fritz) Wamester has been in banking for 39 years. Wamester served Connecticut Bank and Trust for 26 years leaving in 1980 to join Connecticut National Bank, now CT Page 6038 Shawmut.
Wamester has been a commercial loan officer for many years.
Wamester had been involved with perhaps nine to ten loans involving LeFoll all of which had been satisfactorily concluded.
Wamester left Connecticut National Bank in August of 1990. Wamester had many loans under his supervision.
Wamester had known LeFoll since high school days.
On one occasion, Wamester was invited to LeFoll's home on the island of Saint Maartens. Wamester paid his own travel and expenses concerning said trip.
However, Wamester also testified that, at the time this representation was first made in December 1988:
 (i) There was no binding agreement on the part of Shawmut to even lend LeFoll (or LR) the $500,000 that was ultimately loaned;
 (ii) LeFoll had not entered into any commitment obligating himself to Shawmut in any way;
 (iii) The representation assumed that LeFoll would develop two office buildings (not a shopping center) on the Colchester Property;
 (iv) The possibility of subordinating to a permanent mortgage, or to a construction mortgage that would be convertible into a permanent mortgage, was not discussed;
 (v) the terms of any future subordination were left open and were not agreed to as far as the details were concerned;
 (vi) The representation assumed that LeFoll would provide Shawmut with additional collateral if, at the time any subordination was being considered, there was insufficient equity in the Colchester CT Page 6039 Property and Shawmut needed additional collateral; and
 (vii) The issue of LeFoll posting additional collateral in connection with any subordination of the Shawmut Mortgage was something that was left open for future resolution.
Wamester also testified that, when he discussed the possibility of future subordination with LeFoll at the June 30, 1989 Closing:
 (i) He still understood that LeFoll would be developing office buildings on the Colchester Property, the possibility of subordinating to a permanent mortgage, or to a convertible construction mortgage was not discussed, the terms of any future subordination were left open and were not agreed to as far as the details were concerned, it was assumed that LeFoll would provide Shawmut with additional collateral if, at the time any subordination was being considered, there was insufficient equity in the Colchester Property and Shawmut needed additional collateral, and the issue of LeFoll posting additional collateral in connection with any subordination of the Shawmut Mortgage was something that was left open for future resolution; and
 (ii) He had not agreed that LR would be relieved of any of its obligations under the Note, or that the Shawmut Mortgage would become unenforceable, in the event that ultimately Shawmut did not subordinate the Shawmut Mortgage to whatever construction or permanent mortgage to LeFoll might someday request a subordination.
Whereas LeFoll testified that the alleged agreement imposed an "unconditional" obligation on Shawmut, and had conditioned enforceability of the Note and Shawmut Mortgage on Shawmut's delivery of a subordination document whenever LeFoll might request it to do so, Wamester's testimony established that he never understood that Shawmut would have to subordinate even if LR was in default of its obligations under the Note. In testifying that it was inconceivable that CT Page 6040 Shawmut's failure to subordinate would have relieved LR from paying back the $500,000 loan, Wamester established that continued performance of LR's obligations under the Note was a precondition to subordination, and whatever his understanding with LeFoll was, it was not an "unconditional" agreement to subordinate.
It was undisputed that, if it had been made as alleged, the agreement to subordinate the Shawmut Mortgage would have been a "material term" of the loan and mortgage transaction that was closed at the Closing.
Wamester and the officer who was his superior at Shawmut — Richard O'Brien ("O'Brien") — testified that, at the time of the Closing, (i) it was Shawmut's practice (consistent with proper banking practices) to include in the documentation evidencing a loan language documenting all of the material terms of the loan (including any condition subsequent that would require Shawmut to subordinate a mortgage received to secure the loan), and (ii) Bank officers who made loans (including Wamester) understood that all material terms of a loan were to be documented so that superior officers in Shawmut, and bank regulators, who might be reviewing Shawmut's loan portfolio or the performance of loan officers, would be informed about those material terms.
Richard A. O'Brien was a senior vice president with Connecticut National Bank during the period 1986 to April 8, 1994, when he left Connecticut National Bank.
O'Brien managed a group of commercial lending officers.
Diane Murphy, a commercial lending officer of the bank, reported to O'Brien. Fritz Wamester, a commercial lending officer, reported to O'Brien.
LeFoll did not offer testimony contradicting, and in some cases gave testimony confirming, Wamester's testimony that at the time the alleged agreement to subordinate was made: (i) there was no binding agreement on the part of Shawmut to even lend LeFoll (or LR) the $500,000 that was ultimately loaned, (ii) LeFoll had not entered into any commitment obligating himself to Shawmut, (iii) Shawmut's representation regarding subordination, whatever it may have been, had been conditioned on the construction by LeFoll of two office buildings (not a CT Page 6041 shopping center) on the Colchester Property, and (iv) the possibility of subordinating to a permanent mortgage, or to a construction mortgage that would be convertible into a permanent mortgage, had not been discussed.
In addition, LeFoll admitted that his conversation with Wamester had not included any discussion of a standstill agreement or the possible extension of the maturity of the Note or the Shawmut Mortgage beyond the December 31, 1991 date referenced in the addendum attached to the Note.
Not only was there no reference to any representation or agreement concerning subordination of the Shawmut Mortgage in any of the documents delivered at the Closing in June 1989, but it was undisputed that it was not until July 1990, more than one year after the closing of the $500,000 mortgage loan between Shawmut and LR, that the first document mentioning the alleged agreement on the part of Shawmut to subordinate the Shawmut Mortgage came into existence.
Not only was there no mention of any such agreement in any of the documents exchanged at the June 30, 1989 Closing, but Wamester failed to mention any such agreement in the memoranda he prepared so that his superiors and bank examiners might become informed of the material terms of the loan.
By the Summer of 1990, LeFoll no longer planned to develop the Colchester Property as two office buildings, but he had decided instead to develop it as a strip shopping center.
In a July 9, 1990 letter (the "July 9 Letter"), in which LeFoll advised Wamester of his changed plans, LeFoll proposed that Shawmut completely release the Shawmut Mortgage and substitute in lieu thereof a new second mortgage on a commercial building at 2301 Silas Deane Highway, Rocky Hill, Connecticut ("2301 Silas Deane"). In the July 9 Letter, LeFoll expressly recognized (i) that Federal Regulators had classified the LR $500,000 mortgage loan as "non-performing because the collateral securing that loan did not generate any income, and (ii) that Shawmut might be reluctant to subordinate the Shawmut Mortgage to a construction loan because such a subordination "may be frowned upon by the regulators". CT Page 6042
The July 9 Letter was the first document that ever mentioned the alleged oral agreement to subordinate the Shawmut Mortgage. In one sentence that letter casually purported to remind Wamester of an "agreement to subordinate this loan to any construction financing to be used for the development of this parcel", but LeFoll did not call upon Shawmut to subordinate in the event that Shawmut was unwilling to release the Shawmut Mortgage in exchange for the second mortgage position on other property that was proposed by the letter.
Shortly after receiving the July 9 Letter, Wamester left the employ of Shawmut, and responsibility for dealing with LeFoll on behalf of Shawmut was assigned to another officer of Shawmut — Diane Murphy ("Murphy") — who was supervised by Richard O'Brien ("O'Brien"), another officer of Shawmut.
After Shawmut received the July 9 Letter, in early October 1990, Murphy and O'Brien discussed with LeFoll the proposal to substitute collateral that he had made in that Letter. When, in the context of those discussions, Shawmut wanted LeFoll to include a mortgage interest in 2275 Silas Deane Highway as part of the collateral that would be substituted for the Shawmut Mortgage, LeFoll became upset and took the position that, if Shawmut would not accept the substitute collateral he was offering, it (i) should "go back to its original agreement", and (ii) without receiving any substitute collateral or consideration of any kind, should subordinate the Shawmut Mortgage to the first lien of a construction mortgage in favor of the institution that he thought would give him a construction loan — Mechanics Savings Bank ("Mechanics").
Although neither O'Brien nor Murphy specifically remembered being informed by Wamester of the alleged oral agreement to subordinate, their testimony indicated that at some time prior to October 26, 1990 either or both of them learned from Wamester that, when he made the loan to LR in 1989, he had made some kind of representation to LeFoll concerning possible subordination of the Shawmut Mortgage. However, neither Murphy nor O'Brien understood from Wamester that the "agreement" concerning possible subordination was a legally enforceable, unconditional obligation on Shawmut to subordinate the Shawmut Mortgage to any construction or permanent mortgage in any amount, for any term, even when CT Page 6043 subordination would jeopardize Shawmut's interests by leaving it in an undercollateralized position.
Shawmut's $500,000 loan to LR was "classified" pursuant to requirements of federal banking regulations, and those requirements as understood by Shawmut (particularly Murphy and O'Brien) precluded Shawmut from subordinating the mortgage on a basis that would leave Shawmut undersecured.
According to the testimony of both Murphy and O'Brien, they understood that Wamester had agreed to work with LeFoll to give a construction lender a first position on the Colchester Property provided that Shawmut would continue to have adequate collateral for its loan, whether in the form of a first position on the Colchester Property, or a second position on other property alone or together with a second position on the Colchester Property. The understanding of both Murphy and O'Brien that Wamester had not obligated Shawmut to subordinate the Shawmut Mortgage to a construction mortgage if such a subordination would leave Shawmut in an undersecured position and at greater risk of loss, appears to be well-founded given Wamester's testimony that (i) he had assumed that LeFoll would provide Shawmut with additional collateral if, at the time any subordination was being considered, there was insufficient equity in the Colchester Property and Shawmut needed additional collateral; and (ii) the issue of LeFoll posting additional collateral in connection with any subordination of the Shawmut Mortgage was something that had been left open for future resolution.
When she wrote the October 26 letter, Murphy was not motivated by a desire or intent to prevent LR from being able to obtain a construction/permanent mortgage from Mechanics. Rather, Murphy wrote the letter believing she was outlining a basis upon which Shawmut's mortgage would not be an obstacle to LR's efforts to obtain such a mortgage.
On or about October 26, 1990, Murphy prepared a letter to LeFoll ("the October 26 Letter") in which she (i) purported to summarize a conversation she believed had taken place between O'Brien and LeFoll, and (ii) purported to set forth her understanding of the basic terms of an "agreement" that had been reached between LeFoll and O'Brien to carry out what the Letter referred to as "the verbal representation" concerning subordination that she understood had been made by Wamester CT Page 6044 when the loan was made. After her summary of the terms of the agreement she thought had been reached between LeFoll and O'Brien, Murphy concluded the October 26 Letter as follows:
 "If this is your understanding of the conversation with Rick O'Brien please sign below to acknowledge this and return to me."
Following her signature on the October 26 Letter, Murphy provided a signature line upon which LeFoll might provide the requested "acknowledgement".
On or about November 21, 1990, LeFoll signed and returned the October 26 Letter to Shawmut. The relevant text of the October 26 Letter was as follows:
 "1) Connecticut National will subordinate its first mortgage position on Firehouse Square [the Colchester property], a proposed shopping center located at 100 Old Hartford Road, Colchester, CT. This will be subordinated to a Mechanics Savings Bank construction mortgage.
 2) the bank agrees to this subordination and, in lieu of the first mortgage, will receive a second mortgage position on the building owned by R. LeFoll located at 2301 Silas Deane Highway, Rocky Hill. The only other encumbrance on this building is a first mortgage to Society for Savings.
 3) The bank will release its subordinated mortgage position on the Colchester property after the second mortgage position on 2301 Silas Deane has perfected.
 4) The bank will order and pay for an appraisal on 2301 Silas Deane Highway.
 5) Clark, Mayo Gilligan will represent the bank in this transaction. The cost of this legal representation will be borne by you.
 6) The bank will be paid in full no later than December 31, 1991. If the property in St. Maarten is sold prior to December 31, 1991 it is the bank's CT Page 6045 understanding that the proceeds from the sale of this property will be used to reduce and/or payoff this debt."
Although LeFoll testified that he thought the October 26 Letter "was legally enforceable," neither the LR Complaint nor the counterclaims in the LR Answer allege the October 26 Letter as the contract allegedly breached by Shawmut. The breach of contract claims alleged in that Complaint and in the counterclaims are based only on the alleged oral agreement that supposedly came into existence at the Closing as the culmination of the December 1988 and June 1989 conversations between LeFoll and Wamester. While the LR Complaint and the LR Answer referred to the October 26 Letter, they allege only that it was a confirmation of the alleged preexisting oral agreement, and did not allege that it was a separate enforceable agreement.
At trial LeFoll's counsel took the position that the October 26 Letter "speaks for itself". Nevertheless, LeFoll introduced into evidence a November 21, 1990 letter (the "November 21 Letter") that he had written to Shawmut in which he purported to describe "[t]he essence of [the] agreement" as an agreement by Shawmut to "subordinate its first mortgage position on [the Colchester Property] to a construction to permanent mortgage issued by any commercial lending institution", or, "[i]n the alternative" an agreement by Shawmut to release the Shawmut Mortgage upon receipt of a second mortgage position on property at 2301 Silas Deane. [Def. Ex. 9] According to LeFoll, the November 21 Letter proved that the original oral agreement memorialized by the October 26 Letter was an agreement that Shawmut "would one, subordinate the five hundred thousand dollar mortgage to a Mechanics mortgage, or two, take a second mortgage position on 2301 Silas Deane and release the mortgage in Colchester," and did not link an obligation to subordinate to the receipt of the second mortgage position on 2301 Silas Deane.
A review of the October 26 Letter compels the conclusion that the letter cannot reasonably be read as an agreement giving LeFoll a legally enforceable right to require Shawmut to either (i) subordinate the Shawmut Mortgage to a first mortgage in favor of Mechanics, or (ii) to release the Shawmut Mortgage and accept a second mortgage on 2301 Silas Deane. CT Page 6046
 (i) The words "or", "in the alternative", or any verbal equivalents thereof are not to be found anywhere in the October 26 Letter;
 (ii) During cross-examination LeFoll could not identify any specific words in the October 26 Letter that conveyed the notion that subordination and substitution of collateral were intended to be alternative rather than co-equal rights. According to LeFoll, the notion that the rights "created" by paragraphs 1) and 2) (taken together with 3)) of the October 26 Letter were alternatives is not to be derived from any specific words in that document, but "is implicit in the document;" and
 (iii) Not only is there no language in the October 26 Letter that conveys an intention that paragraph 1) be read as an alternative to paragraphs 2) and 3) taken together, but the statement in paragraph 2) of the October 26 Letter that:
 "the bank agrees to this subordination and, in lieu of the first mortgage, will receive a second mortgage position on the building owned by R. LeFoll located at 2301 Silas Deane Highway" (emphasis added)
 unambiguously implies that Shawmut was to receive the second mortgage position on 2301 Silas Deane in addition to a subordinated position in the Colchester Property;
 (iv) LeFoll himself conceded on the witness stand, it would be "nonsensical" to interpret the Letter in such a way that each of the six numbered paragraphs presents a separate and independent alternative to every other numbered paragraph.
The November 21 Letter is not credible or persuasive evidence that the October 26 Letter should be read as an agreement requiring either subordination or substitution of collateral for the further reason that the November 21 Letter makes other claims concerning the agreement supposedly memorialized by the October 26 Letter that are at odds with the structure and language of that document: CT Page 6047
 (i) Whereas paragraph 1) of the October 26 Letter states that subordination would be to a "construction mortgage", the November 21 Letter claims that the agreement had been to subordinate to a "construction to permanent mortgage." LeFoll's testimony that "construction mortgage" necessarily implies "construction to permanent mortgage" is contradicted by (a) the very fact that LeFoll found it necessary to add the words "to permanent" in the November 21 Letter, (b) the testimony of LeFoll and Wamester that they had not discussed subordination to a permanent mortgage; and
 (ii) LeFoll's explicit admission that the "interpretation" supposedly represented by the November 21 Letter actually reflected "modifications" of the agreement memorialized by the October 26 Letter.
Given (i) LeFoll's testimony that he regarded the October 26 Letter to be a binding agreement, and (ii) his admission that he knew that he could have modified the October 26 Letter by inserting words such as "or", "in the alternative", and "to permanent", and initialling in the margin next to those insertions, it is reasonable to infer that the November 21 Letter represented an attempt by LeFoll to create an impression for use in future litigation that the agreement supposedly memorialized by the October 26 Letter was different from what might reasonably be understood from the structure and language of that letter.
After receiving the countersigned version of the October 26 Letter, Murphy advised LeFoll that the October 26 Letter did not contain a listing of "alternatives":
 ". . . I told him that this was one big deal, the subordination and collateral at the same time. It was not subordination or subordination and collateral. He had no choices here."
However, Murphy and O'Brien continued to try to accommodate LeFoll's efforts to put himself in position where he could secure a construction loan with a first lien on the Colchester Property. In that connection, in early December CT Page 6048 1990, consistent with paragraph 4) of the October 26 Letter, Shawmut ordered an appraisal (to be paid for by Shawmut) of the property at 2301 Silas Deane on which it expected to obtain a second lien.
Also in early December 1990 Murphy and/or O'Brien advised LeFoll that Shawmut would accept a second position on 2301 Silas Deane on the understanding that 2301 Silas Deane would be generating sufficient positive cash flow to service the debt owed under the Note, and would subordinate.
According to the unimpeached credible testimony of O'Brien and Murphy, Shawmut would not simply subordinate the Shawmut Mortgage to a construction/permanent mortgage without obtaining additional collateral because to have done so would left Shawmut without sufficient collateral to secure the $500,000 debt that remained unpaid under the Note. Even if the fact that Federal bank regulators were in the process of reviewing Shawmut's loan portfolio may have highlighted the risk that would have been involved in subordinating without obtaining additional collateral, there was no evidence that the decision of O'Brien and Murphy was motivated by any animus or malice toward LeFoll or LR.
In January 1991, Steven Zarrella ("Zarrella"), the Mechanics officer with whom LeFoll was dealing, submitted a presentation for a construction/permanent mortgage loan for approval by the appropriate loan committee at Mechanics. Although, as Zarrella testified, Mechanics would have considered making a simple "construction" mortgage loan to LR that would not have been convertible into a permanent mortgage, LeFoll had not sought such a loan from Mechanics. Accordingly, the presentation that Zarrella submitted only related to a construction mortgage that, upon completion of construction would be converted into a permanent mortgage.
Zarrella's presentation contained a list of ten conditions that had to be fulfilled before Mechanics would be obligated to close the construction/permanent loan to which it related, and approval of the proposed loan by the committee would be subject to compliance with those conditions. Before preparing and submitting the presentation, Zarrella had discussed and negotiated the subject matter of these conditions with LeFoll. CT Page 6049
The evidence does not establish that Shawmut notified Mechanics of LR's default under the note.
One of the conditions of the construction/permanent mortgage loan listed in Zarrella's presentation was that "CNB mortgage on subject property to be released and placed on another LeFoll income property." Zarrella testified that this condition (which required the Shawmut Mortgage to be released not subordinated before Mechanics would close the construction/permanent loan)) reflected information that LeFoll had given him, and accurately reflected an understanding of the agreement he had reached with LeFoll.
Other conditions precedent to a closing of the construction/permanent loan expressed in Zarrella's presentation included (i) receipt by Mechanics of environmental site assessments on the Colchester property and on another LeFoll property at 2275 Silas Deane Highway, and (ii) the leasing of at least 50 percent of the space in the buildings to be constructed on the Colchester property, under leases approved by Mechanics.
On March 25, 1991, Mechanics issued a formal commitment ("the Mechanics Commitment") to make a construction/permanent mortgage loan of "up to One Million and 00/100 Dollars" to LR, and LeFoll accepted that commitment by paying Mechanics half of the $10,000 fee to which Mechanics became entitled upon LeFoll's acceptance of the commitment.
The Mechanics Commitment carried forward as preconditions on Mechanics' obligation to actually make the construction/permanent mortgage loan, the conditions in Zarrella's January presentation (i) that Mechanics receive environmental site assessments on the Colchester property and on another LeFoll property at 2275 Silas Deane Highway, (ii) that at least 50 percent of the space in the buildings to be constructed on the Colchester property be leased under leases approved by Mechanics, and (iii) that Mechanics receive a title insurance policy insuring the lien of Mechanics' mortgage as a first lien on the Colchester Property subject only to such exceptions to title as might be approved by Mechanics.
In addition, the Mechanics Commitment conditioned a closing of the construction/permanent loan on receipt by CT Page 6050 Mechanics of an opinion of counsel confirming that there was "no outstanding or threatened litigation, administrative or other proceedings, the outcome of which could materially and adversely affect" LR. According to Zarrella's unimpeached testimony, Mechanics would not have been obligated to close a loan under the Mechanics Commitment if, by the time of the closing, Shawmut was claiming that LR had defaulted under the Note, and/or Shawmut was threatening to foreclose the Shawmut Mortgage it had on the Colchester property.
According to Zarrella's unimpeached testimony, (i) if Shawmut had subordinated the Shawmut Mortgage on the Colchester Property, Mechanics would not have approved the second lien of that mortgage as an exception to the title and would not have been obligated to close the construction/permanent mortgage loan, (ii) Mechanics would not have been obligated to close the construction/permanent mortgage loan unless the Shawmut Mortgage were first released, and (iii) without a release of the Shawmut Mortgage, Mechanics might have closed the construction/permanent mortgage loanonly if Shawmut would first subordinate that Shawmut Mortgage,and then also enter into a standstill agreement by which Shawmut would agree not to foreclose or take any action against LeFoll for some period of time.
Further, according to Zarrella's unimpeached testimony, because the Mechanics Commitment only committed Mechanics to lend "up to One Million and 00/100 Dollars", and limited disbursements of the loan to amounts equal to "the cost of construction work in place" (less a ten percent retainage), plus other nonconstruction costs and expenses actually paid or payable for approved project costs (all as substantiated by documentation and inspection by Mechanics), Mechanics was not obligated to lend $1,000,000 unless actual construction costs equalled or exceeded that amount. Zarrella further testified that it was never part of his understanding that LR might use some portion of the proceeds of a loan under the Mechanics Commitment to pay off any part of Shawmut's Note, and the inference reasonably drawn from that testimony is that LR would not have been able to apply proceeds of the Mechanics loan to repay Shawmut under the Note (except to the extent that LR had advanced its own funds to pay construction and other costs that were reimbursed by disbursements from the Mechanics loan). CT Page 6051
Undisputed evidence established that, in April 1991, LR failed to pay interest for March 1991 due to Shawmut under the Note, and on May 17, 1991, Shawmut issued default notices and made demands upon LR, as maker, and LeFoll and GLeFoll as guarantors, for payment of the entire principal and accrued interest due under the Note.
At trial, LeFoll testified that, although he had not yet presented Shawmut with an instrument of subordination, and Shawmut had not refused to sign any such instrument, he had failed and refused to pay the interest due to Shawmut under the Note in April 1991, because Shawmut had orally refused to subordinate the Shawmut Mortgage to the lien of a Mechanics construction/permanent mortgage. In that connection, LeFoll also testified that, as of the middle of April 1991, his proposed development of the Colchester property "was over. It was done, it was finis, because I [LeFoll] couldn't resurrect it. . . . could not put it together."
At trial LeFoll admitted that, (i) as of the date in April 1991 when LR failed to pay interest under the Note, and as of the date in May 1991 when he received the default notices, a number of the preconditions to closing under the Mechanics Commitment had not been satisfied, (ii) he had never tendered to Shawmut, and Shawmut had not refused to sign, any instrument constituting the subordination of Shawmut Mortgage that he was seeking, (iii) the refusal of Shawmut to subordinate, upon which he sought to justify his April default, was not evidenced by any contemporaneous writing from Shawmut to LeFoll, and (iv) LeFoll did not document the supposed termination of his development project in April, or the proposition that such a termination had been the reason for his failure and refusal to make the interest payment due in April.
LeFoll does not dispute that, after receiving the notices of default issued by Shawmut, he did not tender to Shawmut payment of any principal or interest due under the Note.
In apparent contradiction to LeFoll's testimony that his proposed development of the Colchester property was over and done by mid-April 1991, the weight of the evidence showed that LeFoll continued to work toward completion of that project after April until mid-July 1991. CT Page 6052
Zarrella's testimony that he understood that LeFoll was still moving forward with development of the Colchester property after April 1991, was confirmed by undisputed documentary evidence establishing that from May through mid-July 1991 LeFoll continued attempting to satisfy the pre-leasing condition of the Mechanics Commitment. These documents show that two of the four leases he was able to get signed (without which he could not possibly have satisfied the condition of the Mechanics Commitment) were dated June 27, 1991, and July 19, 1991, respectively. Those documents also show that, in mid-July 1991, counsel for Mechanics advised LeFoll that he had failed to satisfy the pre-leasing condition of the Mechanics Commitment, and that Mechanics would not close a loan under that commitment unless changes were made to the leases that LeFoll had submitted for approval.
LeFoll's testimony that his proposed development of the Colchester property was over and done by mid-April 1991, is also contradicted by his testimony and by correspondence between LeFoll and Shawmut in May and June 1991:
 (i) After receiving Shawmut's notice of default and demand for payment in May, LeFoll wrote Shawmut demanding that it fulfill the "agreement" to subordinate the Note to a $1,000,000 mortgage in favor of Mechanics;
 (ii) After Shawmut responded that LeFoll had "at no time forwarded to the Bank [Shawmut] a subordination agreement acceptable to you and Mechanics for review or execution by the Bank", on June 10, 1991 LeFoll responded that he had instructed his attorneys to prepare a subordination agreement that he hoped would meet Shawmut's approval;
 (iii) LeFoll continued discussions with Mechanics during the spring and early summer of 1991, and learned that Mechanics would not close a loan under the Mechanics Commitment unless Shawmut entered into a "standstill" agreement in which Shawmut would agree, notwithstanding LR's default, not to bring a foreclosure action until completion of construction;
CT Page 6053
 (iv) On July 17, 1991, counsel for Mechanics had forwarded to LeFoll a Preliminary Agenda for closing a loan under the Mechanics Commitment;
 (v) On July 19, 1991, LeFoll notified counsel for Shawmut that he was still working to close the Mechanics loan, and that he trusted counsel for Shawmut were in the process of completing documentation that, inter alia, would have extended the maturity date of the Note from December 31, 1991 to December 31, 1992.
However, no closing under the Mechanics Commitment was ever held. No correspondence between LeFoll and Mechanics showing precisely when or why no closing ever took place was introduced into evidence. However, a preponderance of the evidence establishes that the reason Mechanics would not close in mid-July 1991 was not that Shawmut not would subordinate the Shawmut Mortgage, but was that (i) Shawmut would not subordinate and agree to a satisfactory standstill agreement that would have required an extension of the maturity of the Shawmut Note, and (ii) LeFoll had not satisfied other conditions of the Mechanics Commitment, including the conditions relating to preleasing and to the delivery of environmental impact assessments.
LeFoll testified that had he been able to close a construction/permanent mortgage under the Mechanics Commitment, he would have been able to complete development of the Colchester property and would have ended up with a property with an equity of $1.2 million, throwing off $100,000 income of per year.
Zarrella testified that LeFoll could have obviated the need for a release of the Shawmut Mortgage, or a subordination of that mortgage coupled with a standstill agreement, if he had simply paid off the Shawmut Mortgage.
LeFoll further testified that:
 (i) If Shawmut had subordinated the Shawmut Mortgage to a Mechanics mortgage in July 1991, he would have paid off the Shawmut Mortgage when it came due in December 1991 using funds obtained in part from the proceeds of the Mechanics loan, and CT Page 6054 largely from cash obtained from the liquidation or refinancing of other real estate holdings in which he had equity of three plus million dollars; and
 (ii) Although he would have been on a tight schedule and would have been spending a lot of time overseeing construction on the Colchester property, during the five month period from August through December 1991, he would have been able to arrange to sell and refinance properties sufficient to yield the $500,000 required to pay off the Shawmut Mortgage on December 31, 1991.
LeFoll admitted that after April 1991, when he claimed that Shawmut had made clear that it would not subordinate the Shawmut Mortgage to a Mechanics construction/permanent mortgage, he made no effort to arrange to sell and refinance properties sufficient to yield the $500,000 required to pay off the Shawmut Mortgage. According to LeFoll, (i) he simply was not going to pay Shawmut the $500,000 owed under the Note because in his view it had breached an agreement to subordinate, (ii) in any event, the four months from April through July was too short a time to refinance or otherwise raise the funds to pay off the Shawmut Mortgage, thus making it possible to go forward and complete development of the Colchester property, and (iii) he "had decided to do nothing further to try and consummate a deal with Mechanics, and instead decided to seek redress from Connecticut National Bank through this lawsuit."
Shawmut's evidence in support of its claim for foreclosure, consisting of a July 25, 1994 appraisal of the Colchester Property and the testimony of the appraiser concerning that appraisal and his update thereof, was not impeached or contradicted. It established that the value of the Colchester Property as of February 10, 1995, was $200,000. The appraiser also testified that the fee paid by Shawmut for the appraiser's services had been $2,000.
Accordingly, there is presently no equity in the Colchester Property.
Although preserving its position that Shawmut is not entitled to recover anything in its foreclosure action, the LeFoll Parties stipulated that, if Shawmut is entitled to CT Page 6055 recover principal and interest under the Note, (i) the unpaid principal and accrued interest under the Note through January 13, 1995, at the pre-default rate specified in the Note, amounts to $654,895.82, (ii) the unpaid interest through January 13, 1995, at the default rate specified in the Note, amounts to an additional $37,138.89, and (iii) additional interest after January 13, 1995 accrues at the rate of 9.5 percent per annum at the basic rate, plus interest at the default rate of two percent per annum.
The parties agreed that Shawmut might attempt to prove the reasonable costs of pursuing collection of the debt due under the Note by an affidavit of counsel attesting to the amount and nature of those costs.
The premise of all of the claims and defenses of the LeFoll Parties was that the conversations of LeFoll and Wamester in December 1988 and at the Closing of the $500,000 Shawmut loan on June 30, 1989 had resulted in a legally enforceable, unconditional agreement by Shawmut to subordinate the first lien on the Colchester Property created by the Shawmut Mortgage to the lien of any construction/permanent mortgage that LR might thereafter want to give to an institutional lender.
Under Connecticut law, LR and LeFoll, as the proponent of such an agreement, had the burden of proving by a preponderance of the evidence (i) the existence of the alleged agreement, (ii) that the contents of the alleged agreement were what LeFoll claimed them to be, (iii) that LR fulfilled the conditions on its part under the alleged agreement, whereas Shawmut did not, and (iv) to the extent that damages for breach are claimed, the fact and amount of those damages.Vigorito v. Allard, 143 Conn. 70, 71 (1955); Kieffer v.Danaher, Tedford, et al, 1990 WL 265725 p. 11 (Healy, Trial Referee, December 20, 1990); Chem-Tek, Inc. v. General MotorsCorp., 816 F. Sup. 123, 131 (D.Conn. 1993).
To form a valid and binding contract in Connecticut, there must be a mutual understanding on terms that are definite and certain between the parties. Ubysz v. DiPietro,185 Conn. 47, 51 (1981); Augeri v. C.F. Wooding Co., 173 Conn. 426,429-30 (1977); Cavallo v. Lewis, 1 Conn. App. 519, 520
(1984). To satisfy their burden of proving such a contract, LR and LeFoll were required to established by a preponderance CT Page 6056 of the evidence that there was an offer and acceptance, each of which "must be found to have been based on an identical understanding by the parties." Bridgeport Pipe Engineering Co.v. DeMatteo Construction Co., 159 Conn. 242, 249 (1970).
If the minds of the parties have not truly met, no enforceable contract exists. Fortier v. Newington Group, Inc.,30 Conn. App. 505, 510 (1993).
The failure of parties to agree to particular terms of a contract may evidence an intention not to be presently bound by certain discussions. Calamari Perillo, The Law ofContracts, 2d Ed. 1977, § 2-13, p. 51. "So long as any essential matters are left open for further consideration, the contract is not complete." American Jurisprudence,
2nd Ed. 1991, Vol 17A, § 32, p. 60.
Since the LeFoll Parties claim that Shawmut's failure to subordinate the lien of the Shawmut Mortgage to a construction/permanent mortgage in favor of Mechanics relieved LR of any obligation to pay interest and principal under the Note, and rendered the Shawmut Mortgage unenforceable, to satisfy their burden of proof, the LeFoll Parties had to prove by a preponderance of the evidence that on June 30, 1989, the minds of LeFoll and Wamester had met on an identical, complete agreement that unconditional subordination would be a condition on (i) LR's obligation to pay under the Note, (ii) Shawmut's right to foreclose under the Shawmut Mortgage, and (iii) the obligations of LeFoll and GLeFoll under their personal guarantees.
Furthermore, since the LeFoll Parties base their contractual claims on an agreement that they claim was oral and was entered into no later than the Closing of the $500,000 Shawmut loan to LR on June 30, 1989, under the Parol Evidence Rule they had to prove by a preponderance of the evidence that the agreements represented by the Note, Shawmut Mortgage, guaranty and other documents signed and delivered at that Closing, taken separately or together, did not constitute an "integrated" agreement between the parties concerning (i) the terms and conditions governing repayment of the loan under the Note, (ii) the terms and conditions governing Shawmut's rights to foreclose under the Shawmut Mortgage, (iii) the terms and conditions governing the parties' rights and obligations under the guarantees, and (iv) the nature, priority and duration of CT Page 6057 the lien that LR was providing to Shawmut under the Shawmut Mortgage to secure repayment of the $500,000 loan.
The Parol Evidence Rule is a substantive rule of law that forbids a Court from relying on evidence of oral agreements made prior to or contemporaneously with the formation of an integrated written agreement, to vary or contradict the terms of that written agreement. TIE Communications, Inc. v. Kopp,218 Conn. 281, 287-88 (1991). "If a written contract is found to be a final repository of agreements made between the parties, evidence of a prior unwritten agreement would not be allowed to have any effect on the agreement as integrated in writing." Damora v. Christ-Janer, 184 Conn. 109, 113 (1981). Whether a document constitutes an integrated agreement is a question fact for the Court and "the burden is on the party attempting to prove the absence of integration." Neidetz vHousing Authority, 43 Conn. Sup. 283, 289 (1994).
The LeFoll Parties failed to prove by a preponderance of the evidence that the written agreements delivered at the June 30, 1989 Closing were not integrated. Indeed, the overwhelming weight of the evidence in the present case establishes that the agreements evidenced by the Note and Shawmut Mortgage delivered at that Closing were integrated, did not contain the agreement upon which the LeFoll Parties base their claims and defenses, and in fact were completely inconsistent with the existence of any such agreement.
As already found above, the Note in form is not a skeletal promise to repay moneys loaned, and does not serve merely as evidence of LR's obligation to repay $500,000 to Shawmut. Nor is the Note ambiguous concerning the unconditional nature of LR's obligation to pay interest and principal thereunder. In that regard, the Note contains a detailed recitation of the terms and conditions relating to repayment, defines the circumstances constituting a default, and describes Shawmut's remedies in the event of a default. Similarly, the Shawmut Mortgage in form is not a skeletal document. It too contains a detailed recitation of the rights and interests of Shawmut as mortgagee, and very clearly defines the priority of the lien intended to be created by the instrument. There is nothing in either the Note, the Shawmut Mortgage, or any of the other security documents delivered by LR and LeFoll at the Closing, suggesting that these documents, taken together, were not intended to constitute the CT Page 6058 complete and final expression of the parties' intention concerning the nature, priority and duration of the lien that LR was providing to Shawmut to secure repayment of the $500,000 loan. Together, these documents constituted an integrated agreement concerning the nature, priority and duration of the lien created by the Shawmut Mortgage.
Further, and again as already found as a fact, the conclusion that the agreements signed and delivered at the Closing constituted an integrated agreement concerning the nature, priority and duration of the lien created by the Shawmut Mortgage is reinforced by the Ripper Opinion which treated those agreements as though they were intended to constitute the complete and final expression of the parties' intention concerning the nature, priority and duration of the lien that LR was providing to Shawmut to secure repayment of the $500,000 loan. The Ripper Opinion did not mention any agreement on the part of Shawmut to subordinate the Shawmut Mortgage to a future construction and/or permanent mortgage on the Colchester Property, and did not say anything to suggest that LR's obligation to pay interest or principal due under the Note, or the right of Shawmut to foreclose under the Shawmut Mortgage in the event of any default under the Note, was subject to or dependent upon Shawmut's performance of any oral agreement concerning subordination of the Shawmut Mortgage. Furthermore, Ripper's testimony established (i) that the Shawmut Mortgage deed would have been written differently if any agreement to subordinate the Shawmut Mortgage had existed, and (ii) that he would not have given the opinion that the Shawmut Mortgage was valid and enforceable in accordance with its terms if he had thought that an agreement to subordinate the Shawmut Mortgage had existed.
Even if the Parol Evidence Rule did not exist as an insurmountable obstacle precluding the LeFoll Parties from proving the contract upon which virtually all of their claims and defenses are premised, they still would have failed to satisfy their burden of proving the existence of that contract. In any given case the Court's determination whether an alleged contract with an alleged content entered into may be based on the conduct of the parties; "[t]here are times when what a person is about may be disclosed from an examination of his own acts but, on occasion, that becomes ever clearer when the interaction and sequences of his behavior, express and fairly to be inferred, with those of CT Page 6059 others in the context of the ebb and flow of relevant circumstances are considered." Kieffer v. Danaher, Tedford, etal, 1990 WL 265725 p. 11 (Healy, Trial Referee, December 20, 1990).
Although Wamester's testimony indicated that he had made what some, in common parlance, might characterize as an "agreement", a preponderance of the evidence (including Wamester's testimony concerning his understanding of the "agreement", and his contemporaneous conduct) does not establish that the conversations between LeFoll and Wamester in December 1988 and June 1989 led to a meeting of the minds that the payment of interest and principal under the Note, and the enforceability of the Shawmut Mortgage, was conditioned on Shawmut unconditionally subordinating the Shawmut Mortgage to a construction/permanent mortgage whenever LeFoll might request such a subordination:
 (i) Wamester expressly denied that he ever had such an understanding or intention. Whereas LeFoll testified that the alleged agreement had conditioned enforceability of the Note and Shawmut Mortgage on Shawmut's delivery of a subordination document whenever LeFoll might request it to do so, Wamester testified that it was not conceivable to him that any loan by Shawmut would have been subject to such a condition.
 (ii) Wamester's testified that (a) the terms of any future subordination were left open and were not agreed to as far as the details were concerned, (b) that he understood LeFoll would provide Shawmut with additional collateral if, at the time any subordination was being considered, there was insufficient equity in the Colchester Property and Shawmut needed additional collateral, and (c) that the issue of LeFoll posting additional collateral in connection with any subordination of the Shawmut Mortgage was something that was left open for future resolution.
 (iii) LeFoll claims that the contract he seeks to enforce was completed at the June 30, 1989 Closing. However, the memorandum that Wamester prepared for Shawmut's files shortly after that Closing CT Page 6060 purported to summarize the transactions that had been completed at the Closing, but made no mention of any agreement to subordinate the Shawmut Mortgage; nor did another memorandum summarizing those transactions that Wamester prepared approximately six months later, in December 1989.
Wamester's testimony, and his post-Closing memoranda, establish that there had been no meeting of the minds on terms that were definite and certain between the parties, that there was not a complete contract regarding subordination, that the parties did not have an identical understanding of their respective rights and obligations with respect to a future request to subordinate, and that Wamester did not believe that he had bound Shawmut to a legally-enforceable agreement that would relieve LR and LeFoll of their obligations under the Note and guaranty, and would render the Shawmut Mortgage unenforceable, if Shawmut did not subordinate unconditionally to any construction/permanent mortgage that LeFoll might subsequently seek to place on the Colchester property.
The conclusion that Shawmut and LeFoll had not entered into a binding enforceable agreement that Shawmut would unconditionally subordinate the Shawmut Mortgage to any subsequent construction/permanent loan is reinforced by:
 (i) The fact that prior to the Closing neither Wamester nor LeFoll claimed to have notified Ripper of any such agreement, nor did either of them question Ripper's failure to mention any such agreement in the opinion he delivered at the Closing.
 (ii) Although LeFoll was emphatic that the agreement upon which his claims are based included an agreement to subordinate the Shawmut Mortgage to a permanent mortgage, as well as to a construction mortgage, he admitted and Wamester confirmed that in the conversations giving rise to the alleged oral agreement, they had never even discussed the possibility of a future permanent mortgage.
 (iii) The evidence showed that LeFoll is an experienced attorney and real estate developer who tries to pay attention to detail, who admits that CT Page 6061 he would have advised a client to obtain written confirmation of the oral agreement at the closing of the mortgage loan to which it related, and who knows how to write what might fairly be characterized as self-serving letters describing conversations and transactions in which he has participated. Nevertheless, LeFoll did not ask for written confirmation of the agreement when he closed that loan, nor did he prepare any document referring to the alleged agreement until more than one year after the Closing.
 (iv) If, in July 1990, LeFoll had had a firm conviction that Wamester had made a legally-enforceable agreement to unconditionally subordinate the Shawmut Mortgage to any construction/permanent mortgage upon demand, his July 9 Letter to Shawmut (the first document that ever referred to the oral "agreement") would have contained language making clear that the proposal LeFoll was making to substitute collateral for a release of the Shawmut Mortgage was being proposed as an alternative to the unconditional subordination to which he later claimed he was legally entitled. Although LeFoll's later letter in November 1990 shows that he knew how to characterize his proposal and the supposed agreement to subordinate as "alternatives", when he first made the proposal, he did not make clear that it was simply an alternative to subordination. The fact that he did not, and the way he purported to remind Shawmut of an "agreement" he knew was not mentioned in any prior document, suggests a realization on his part that the "agreement" was not what he now claims it to have been — a legally-enforceable agreement relieving LR of its obligations under the Note, and rendering the Shawmut Mortgage unenforceable, in the event that Shawmut did not subordinate unconditionally upon demand.
Not only have the LeFoll Parties failed to satisfy their burden of proving the existence and contents of the alleged agreement upon which their claims and defenses are based, but they have also failed to satisfy their burden of proving (i) CT Page 6062 that LR would have obtained a construction/permanent mortgage but for its inability to obtain a subordination document from Shawmut, and (ii) the fact and amount of the damages they claim were caused by the inability to obtain such a subordination document.
Where an alleged contract conditions one party's performance on the satisfaction of one or more conditions precedent, the party claiming a failure of that performance has the burden of proving that the conditions precedent were satisfied or that satisfaction of those conditions was legally excused. 3A Corbin, Contracts Sec. 749 (1960) Absent proof that the conditions precedent were satisfied, the party claiming breach cannot satisfy its further burden of proving that whatever damages are claimed flowed directly from the alleged breach, and did not result from failure to satisfy those conditions. Ravitch v. Stollman Poultry Farms, Inc.,165 Conn. 135, 149 (1973).
If, as LeFoll claims, the agreement to subordinate was an inherent part of the mortgage loan transaction entered into on June 30, 1989, that agreement implicitly conditioned Shawmut's obligation to subordinate on prior performance by LR of all of the obligations to be performed on its part prior to the time Shawmut might be required to subordinate. Given LeFoll's admissions that, as of the date upon which he first failed and refused to pay interest under the Note, (i) he had not provided Shawmut with any document or instrument of subordination to Mechanics Savings Bank to sign, (ii) he did not have written signed leases satisfactory to Mechanics Savings Bank for 50% of the space in the building to be constructed, and (iii) a closing date had not been scheduled with Mechanics, prima facie LR materially breached its obligations under the Note, thereby relieving Shawmut of its obligation to subordinate.
LeFoll's testimony that, when he refused to pay interest under the Note in April 1991 he thought the proposed development of the Colchester property "was over. . . . done, . . . . finis" and beyond resurrection is contradicted by his conduct from that point in time until mid-July 1991. The most reasonable inference to draw from his continuing efforts during that period to obtain a construction/permanent mortgage from Mechanics (including his efforts to satisfy the preleasing condition of the Mechanics Commitment) is that he CT Page 6063 did not believe the proposed development "was over. . . . done, . . . . finis" and beyond resurrection until mid-July, at which time he had been in default for three months and the time within which he might have cured that default had expired. Accordingly, the LeFoll Parties did not satisfy their burden of proving that the material default under the Note had been cured or excused.
The conclusion that the LeFoll Parties did not satisfy their burden of proving (a) that Shawmut was ever presented with a request to subordinate to a "construction loan" that was consistent with the Wamester "representations" referenced paragraph "1)" of the October 26 Letter, and (b) that Shawmut's failure to subordinate caused Mechanics to refuse to make the construction/permanent mortgage loan upon which continued development of the Colchester Property depended is reinforced by Zarrella's testimony.
 (i) Although, as Zarrella testified, Mechanics would have considered making a simple "construction" mortgage loan to LR that would not have been convertible into a permanent mortgage, LeFoll had not sought such a loan from Mechanics.
 (ii) According to Zarrella's unimpeached testimony, Mechanics would not have been obligated to close a loan under the Mechanics Commitment if, by the time of the closing, Shawmut was claiming that LR had defaulted under the Note, and/or Shawmut was threatening to foreclose the Shawmut Mortgage it had on the Colchester property.
 (iii) According to Zarrella's unimpeached testimony, (A) if Shawmut had subordinated the Shawmut Mortgage on the Colchester Property, Mechanics would not have approved the second lien of that mortgage as an exception to the title and would not have been obligated to close the construction/permanent mortgage loan, (B) Mechanics would not have been obligated to close the construction/permanent mortgage loan unless the Shawmut Mortgage were first released, and (C) without a release of the Shawmut Mortgage, Mechanics might have closed the construction/permanent mortgage loan only if CT Page 6064 Shawmut would first subordinate that Shawmut Mortgage, and then also enter into a standstill agreement by which Shawmut would agree not to foreclose or take any action against LeFoll for some period of time (something that even LeFoll did not claim to have discussed or agreed to with Wamester).
Given Zarrella's testimony, and the corroborating evidence represented by the Mechanics Commitment, that Mechanics would not have completed a construction/permanent loan if the Shawmut Mortgage had merely been subordinated in accordance with the agreement alleged by LR, the LeFoll Parties have failed to satisfy their burden of proving that Shawmut's failure to subordinate made any difference or caused the "damage" represented by LR's inability to continue with development of the Colchester Property. Whether Mechanics would have required a release of the Shawmut Mortgage, or would have proceeded if Shawmut had merely subordinated and entered into a standstill agreement, the fact is that Mechanics would not have made the construction/permanent loan unless Shawmut had done more by way of altering its position under the Shawmut Mortgage than it was obligated to do by the agreement alleged by LR.
The conclusion that the LeFoll Parties have failed to satisfy their burden of proving that Shawmut's failure to subordinate made any difference or caused the "damage" represented by LR's inability to continue with development of the Colchester Property, because Mechanics would not have completed a construction/permanent loan if the Shawmut Mortgage had merely been subordinated in accordance with the agreement alleged by LR, is reinforced by failure of the LeFoll Parties to prove that they had satisfied another condition on Mechanics obligation to complete a loan under the Mechanics Commitment — the condition requiring delivery of an environmental impact assessment.
In an action based on contract, a claimant "clearly ha[s] a duty to exercise reasonable conduct to minimize the damages occasioned by the defendant's breach. . . ." Willametz v.Goldfeld, 171 Conn. 622, 627 (1976); Burkle v. Superflow Mfg.Co., 137 Conn. 488, 492 (1951). "The concept of mitigation of damages presupposes that an injured party has one or more courses of conduct available at or after the time a breach CT Page 6065 occurs and an obligation therefore exists to pursue that course that results in the least damages to the offending party." Rametta v. Stella, 214 Conn. 484, 492 (1990). Seealso, Danpar Associates v. Somersville Mills Sales Room, Inc.182 Conn. 444, 446 (1980).
LeFoll admitted having in excess of $3 million in assets in April 1991 when, according to him, Shawmut's breach occurred. He further admitted that those assets were sufficient to enable him to raise the $500,000 that LR would have needed to pay off the Shawmut Note by the end of December 1991, even if Shawmut had subordinated and Mechanics had completed a construction/mortgage loan in July 1991. He testified that, even though he would have been busy supervising construction on the Colchester Property and related activities, the five months between the anticipated closing of a loan from Mechanics and the maturity date of the Note, he would have been able to liquidate or refinance sufficient assets to enable LR to repay the Note. However, LeFoll also admitted that after he came to believe that Shawmut would not subordinate unconditionally, he never considered obviating the obstacle that the Shawmut Mortgage presented to consummation of a loan from Mechanics by liquidating or refinancing properties sufficient to enable LR to prepay the Note on a basis that would have preserved any rights LR may have had to claim damages caused by the failure to subordinate.
LeFoll argues that his failure to mitigate damages should be excused because the four and one-half months between the time he claims to have learned that Shawmut would not subordinate, and the time when Mechanics would have closed a loan under the Mechanics Commitment, was not long enough to enable him to do whatever had to be done to liquidate or refinance assets sufficient to raise the amount due under the Note. That contention is not credible since, if, as LeFoll also testified, he would have been able to accomplish the liquidation and refinancing of assets in the August through December, even though during that period he would have been busy supervising construction. In fact, as LeFoll testified, instead of mitigating his damages he "had decided to do nothing further to try and consummate a deal with Mechanics, and instead decided to seek redress from Connecticut National Bank through this lawsuit." CT Page 6066
In short, the undisputed evidence establishes that LR and LeFoll did not make a reasonable effort to mitigate the damages that they now claim flowed from Shawmut's refusal to subordinate the Shawmut Mortgage.
In addition to claiming that Shawmut breached an express oral contract to subordinate the Shawmut Mortgage, the LR Complaint and the LR Answer also allege that Shawmut breached an obligation of good faith and fair dealing that would be implied in such a contract as a matter of law. Cf., RhodeIsland Hospital Trust v. Martin Trust, 6 Conn. L. Rptr. No. 2, 75 (Conn.Super. 1992). However, as the Connecticut Supreme Court has observed, that "duty of good faith" is "[e]ssentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." Magnan v. Anaconda Industries,Inc., 193 Conn. 558, 567 (1984) (emphasis added). In short, the implied obligation of good faith alleged in the LR Complaint and LR the LR Answer did not exist unless there first existed an enforceable oral agreement to subordinate from which the implied obligation is to be implied. Dacourt Group,Inc. v. Babcock Industries, Inc., 747 F. Sup. 157, 160
(D. Conn. 1990). An implied obligation of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. Neidetz v. Housing Authority, 43 Conn. Sup. 283,294 (1994).
Since the LeFoll Parties failed to satisfy their burden of proving the existence of the oral agreement to subordinate the Shawmut Mortgage, they have failed to satisfy their burden of proving an essential element of their claims that Shawmut breach an obligation of good faith and fair dealing implied as part of such an oral agreement.
Even if the LeFoll Parties had satisfied their burden of proving the existence of the oral agreement to subordinate that was the premise of the alleged breach of an implied obligation of good faith, they failed to satisfy their further burden of proving that Shawmut's failure to subordinate breached that obligation. "Good faith" has been defined as "that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." Rhode Island HospitalCT Page 6067Trust v. Martin Trust, 6 Conn. L. Rptr. No. 2, 75, 77 (Conn.Super. 1992). In order to prevail on their claim of breach of duty of good faith and fair dealing, the LeFoll Parties had to prove that Shawmut acted with the subjective intent to defraud or take advantage of them, or acted in a manner which was dishonest. They had to prove more than a mere purported breach of contract, but had to prove that Shawmut intended to take "unconscientious advantage" of them. Phillipe v. Thomas,3 Conn. App. 471, 474 (1985).
The LeFoll Parties have failed to satisfy their burden of proving that the Shawmut officers who decided not to subordinate the Shawmut Mortgage unconditionally were motivated by malice, dishonesty or an intention to defraud LR or LeFoll.
 (i) Given (A) the absence of any reference to a subordination agreement in the Note, the Shawmut Mortgage or the Guarantees, (B) the absence of any reference to a subordination agreement in the file memoranda that Wamester had prepared to memorialize the material terms of Shawmut's loan to LR, and (C) Ripper's unqualified opinion that the Note and Shawmut Mortgage were valid and enforceable in accordance with their terms — an opinion that could not have been given if the agreement to subordinate alleged by the LeFoll Parties had existed, from their review of Shawmut's files it was reasonable for Murphy and O'Brien to believe that whatever representation or "agreement" Wamester had made, it did not give rise to a legally enforceable obligation on the part of Shawmut to subordinate unconditionally, whether or not subordination would leave Shawmut without adequate security for its loan.
 (ii) The testimony of O'Brien and Murphy, their contemporaneous memoranda, and the October 26 Letter, all tend to prove that Shawmut was diligently doing what Wamester testified he would have done if, when LeFoll requested subordination of the Shawmut Mortgage, Wamester had felt that Shawmut's interests might be prejudiced because subordination would leave Shawmut with insufficient collateral.
CT Page 6068
 (iii) Indeed, Murphy and O'Brien both thought that the October 26 Letter was an agreement, and, pursuant to that Letter Murphy and O'Brien attempted to work out an arrangement with LeFoll that would allow LeFoll to complete the development of the Colchester Property while at the same time protecting Shawmut's interests.
 (iv) O'Brien's testimony that he believed (A) that he was entitled to condition any subordination on the receipt of substitute or additional collateral to protect Shawmut's interests, and (B) that, if a lien in substitute collateral had been provided and perfected, Shawmut would have subordinated the Shawmut Mortgage and would have released the Shawmut Mortgage, all in accordance with the terms of the October 26 Letter, establish that he and Shawmut were attempting to help LeFoll obtain the Mechanics loan without forcing him to prepay the Note and without violating responsibilities to protect the interests of Shawmut and its depositors.
The evidence thus establishes that O'Brien and Shawmut were attempting to help LeFoll obtain the Mechanics loan without forcing him to prepay the Note and without violating responsibilities to protect the interests of Shawmut and its depositors.
In addition to claims for breach of contract, the LR Complaint and the LR Answer also contain counts alleging promissory estoppel as the basis of claims that prevent Shawmut from enforcing the Note and the Shawmut Mortgage, and rendering Shawmut liable in damages. The LR Answer also alleges equitable estoppel as a special defense.
In order to prove a claim under the doctrine of promissory estoppel, or a defense of equitable estoppel, the LeFoll Parties must demonstrate "[1] a clear and unambiguous promise; [2] a reasonable and foreseeable reliance by the party to whom the promise is made; and [3] an injury sustained by . . . reason of his reliance." Dacourt Group, Inc. v. BabcockIndustries, Inc., 747 F. Sup. 157, 161 (D.Conn. 1991). Moreover, promissory estoppel will be found only where (i) the CT Page 6069 promisor should reasonably expect to induce action or forbearance by the promisee, (ii) such promise does in fact induce action or forbearance, and (iii) "if injustice can be avoided only by enforcement of the promise." D'Ulisse-Cupo v.Board of Directors of Notre Dame High School, 202 Conn. 206,213 (1987) (quoting Section 90 of the Restatement (Second) Contracts).
Similarly, equitable estoppel requires proof of an act that is intended or calculated to induce another to believe in the existence of certain facts and to act on that belief to his detriment. It is fundamental to proof of a claim of equitable estoppel that the party claiming the benefit of that doctrine must show that he had exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonable available means of acquiring knowledge of the truth. Bozzi v. Bozzi, 177 Conn. 232,241-42 (1979); Spear-Newman, Inc. v. Modern FloorsCorporation, 149 Conn. 88, 92 (1961)
For the same reason that the LeFoll Parties have failed to satisfy their burden of proving the existence of a contract to unconditionally subordinate the Shawmut Mortgage, they have failed to satisfy their burden of proving a "clear and definite promise which a promisor could reasonably have expected to induce reliance." Id. Indeed, to use the doctrine of promissory estoppel or equitable estoppel to enforce the oral promise to unconditionally subordinate that LeFoll claims Wamester made in December 1988 and June 1989 would contradict the parol evidence rule insofar as it would vary the terms of an integrated written agreement. Thus, to prevail on their claims that "the oral agreement and representations", by Wamester should "promissorily" or "equitably" estop Shawmut from enforcing the Note, Mortgage or Guaranty Agreements" the LeFoll Parties must first satisfy their burden of proving that, because of the "oral agreement and representations", the Note, the Shawmut Mortgage and the Guarantees were not integrated agreements and were not legally enforceable in accordance with their terms. As already stated, the LeFoll Parties failed to satisfy that burden.
Accordingly, these claims and defenses are without merit, do not entitle the LeFoll Parties to any remedy against Shawmut, and do not defeat Shawmut's right to a judgment of foreclosure and an award of fees and costs. Furthermore, CT Page 6070 Wamester's testimony that he did not believe his oral representation would preclude him from asking for additional collateral if subordination would leave Shawmut undercollateralized establishes that he did not believe LeFoll was relying on an unconditional promise to subordinate. Finally, given LeFoll's testimony that, as an experienced lawyer he would have advised a client to demand written memorialization of the oral promise on which he claims to have relied, his alleged reliance on that supposed promise as the basis for everything he did to develop the Colchester property could not have been reasonable.
In Count Four of the LR Complaint and Count Five of the Counterclaim included in the LR Answer, the LeFoll Parties allege fraud claims. Specifically, the LeFoll Parties allege that Shawmut issued the October 26 Letter knowing (i) that LeFoll would rely on that letter to proceed with his efforts to obtain the Mechanics Commitment, (ii) that it had no intention of proceeding in accordance with the contents of that letter, and (iii) that Shawmut's failure to proceed as outlined in the October 26 Letter caused LR to lose the financing represented by the Mechanics Commitment.
"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed." Billington v.Billington, 220 Conn. 212, 217 (1991). An action based on fraud requires proof of the following elements: (1) "a false representation made as a statement of fact," (2) the statement made was untrue and known by the party making it to be untrue, (3) the statement was made with the intention of inducing the other party to act or rely on it, and (4) the other party did act or rely on the false statement to his detriment. Id.; see also, Paiva v. Vanech Heights Construction Co., 159 Conn. 512,515 (1970).
Furthermore, in Connecticut, "fraud must be proven by a standard more exacting than a preponderance of the evidence". Rather, fraud must be proven by "clear and satisfactory evidence" or "clear, precise and unequivocal evidence."J. Frederick Scholes Agency v. Mitchell, 191 Conn. 353, 358
(1983)
For the same reasons that the LeFoll Parties failed to satisfy their burden of proving that Shawmut acted in bad CT Page 6071 faith, they have failed to prove by clear and convincing evidence that the October 26 Letter represented a knowingly false statement of Shawmut's intentions. Not only did the LeFoll Parties fail to introduce clear and convincing evidence from which the requisite scienter on the part of Shawmut might reasonably be inferred, but Shawmut documents and the testimony of Murphy and O'Brien that the LeFoll Parties themselves introduced into evidence tend to prove that Murphy and O'Brien conscientiously tried to negotiate a subordination or release of the Shawmut Mortgage, coupled with a substitution or addition of collateral, all as outlined in the October 26 Letter.
Furthermore, the evidence that LeFoll was unable to satisfy conditions of the Mechanics Commitment having nothing to do with the Shawmut Mortgage — preleasing at least fifty percent of the buildings to be constructed, and the delivery of required environmental impact assessments — established that LeFoll's inability to obtain financing from Mechanics was not caused by any alleged failure on Shawmut's part to carry through with the October 26 Letter.
Finally, since the LeFoll Parties have not introduced clear and convincing evidence overcoming the inference that they failed to take reasonable efforts to prepay the Shawmut Mortgage so as to prevent the lien of that mortgage from serving as an obstacle to a Mechanics construction loan, they have failed to satisfy their burden of proving that the damages they claim were caused by the fraud that they allege.
Count Six of the LR Complaint alleged a claim that Shawmut wrongfully attempted to extort additional collateral from the LeFoll Parties when, "some time after March 25, 1991" Shawmut stated that it would not subordinate unless it received additional or substitute collateral, and that it was the taking of that position at that time that caused the damages represented by Mechanics failure to close a loan under the Mechanics Commitment. The same claim is alleged in Count Six of the Counterclaim found in the LR Answer.
Count Six of the LR Complaint was struck by agreement of the parties. [LR Realty, et al. v. Connecticut National Bank,1993 Conn. Super. Lexis 665 (Super.Ct. New London, filed March 24, 1993)] However, since that claim as alleged in the LR Answer was not also struck, it must be addressed and CT Page 6072 disposed of by the Court at this time.
A party claiming damages caused by wrongful economic duress has the burden of proving "wrongful conduct" that "strips" the claimant of his or her "free will", or, by inducing "a fearful state of mind in the other party, which makes it `impossible for him to exercise his own free will.'"Zebedeo v. Martin E. Segal Co., Inc., 582 F. Sup. 1394, 1417
(D.Conn. 1984). Where the alleged economic duress consists of an insistence on payment by a purported creditor, the party alleging the duress must prove that the purported creditor had no reasonable ground to believe that it was entitled to payment. Weiner v. Minor, 124 Conn. 92, 94 (1938).
The LeFoll Parties have not satisfied their burden of proving that Shawmut had no reasonable ground to believe that it was entitled to proceed as it did in late 1990 and early 1991 with respect to subordination of the Shawmut Mortgage. Indeed, the testimony of Wamester, whose testimony was introduced and relied on by the LeFoll Parties, establishes that, at the very time he made the oral representation upon which the LeFoll Parties rely, he believed that Shawmut would not be obligated to subordinate unconditionally if, at the time LeFoll requested a subordination, the equity in the Colchester Property would be insufficient to adequately protect Shawmut's interests. Moreover, the LeFoll Parties failed to introduce any evidence tending to prove that it was Shawmut's failure to provide an unconditional subordination that precluded the LeFoll Parties from obtaining a loan under the Mechanics Commitment. There was no evidence linking Shawmut to LeFoll's inability to satisfy the preleasing or environmental impact assessment conditions of the Mechanics Commitment. The LeFoll Parties failure to provide a credible explanation for LeFoll's failure to attempt to obviate the need for a subordination by prepaying the Shawmut Note results in a failure to satisfy their burden of proving that any actions on Shawmut's part prevented Mechanics from making a loan under the Mechanics Commitment.
Count Seven of the Counterclaim found in the LR Answer alleges that Shawmut's refusal to unconditionally subordinate the Shawmut Mortgage to a construction/permanent mortgage in favor of Mechanics was an intentional interference with the contract and beneficial relationship represented by the Mechanics Commitment. According to that Count, it was CT Page 6073 Shawmut's refusal to subordinate that "thwarted, prevented and interfered with" the LeFoll Parties' ability to obtain the mortgage loan from Mechanics, and caused the damages represented by the loss of the value that the property would have had if it had been completed and fully rented.
In order to satisfy their burden of proving a cause of action for tortious interference with a prospective contractual relationship, the LeFoll Parties were required to prove: (1) "the existence of a contractual or beneficial relationship", (2) Shawmut's knowledge of that relationship, (3) an intent on Shawmut's part to interfere with that relationship, and (4) that the losses allegedly suffered as a result were caused by the intentional interference. Solomon v.Aberman, 196 Conn. 359, 364 (1989). Moreover, "not every act that disturbs a contract or business expectancy is actionable." Blake v. Levy, 191 Conn. 257, 260 (1983). The LeFoll Parties must prove that they were deprived of an opportunity they otherwise would have had; and that their injury was caused by Shawmut's willful or malicious conduct beyond the fact of the interference itself. American BusinessProducts, Inc. v. Hankinson, 7 CSCR 739, 741 (Conn.Super. May 19, 1992).
For the very same reasons that the LeFoll Parties have failed to satisfy their burdens of proving (i) that Shawmut breached an oral agreement to unconditionally subordinate, (ii) that Shawmut was estopped from refusing to subordinate unconditionally, (iii) that the October 26 Letter was a fraud on Shawmut's part, and (iv) that Shawmut committed economic duress, the LeFoll Parties have failed to satisfy their burden of proving (1) that Shawmut's refusal to unconditionally subordinate to a Mechanics loan was motivated by a willful or malicious intent to interfere with the LeFoll Parties ability to obtain a loan from Mechanics, and (2) but for the actions of Shawmut, the LeFoll Parties would have obtained a loan under the Mechanics Commitment.
Contrary to the claims of the LeFoll Parties, the weight of the evidence establishes (i) that Shawmut did not unconditionally subordinate because, consistent with Wamester's original understanding of his conversations with LeFoll, the officers responsible for that decision did not believe that subordination was required or appropriate if it would leave the bank in an undercollateralized position, and CT Page 6074 (ii) that the LeFoll Parties' inability to close a loan under the Mechanics Commitment resulted from LeFoll's failure to satisfy conditions of the Mechanics Commitment having nothing to do with Shawmut, and from his failure to even attempt to obviate the need for a subordination by prepaying the Shawmut Note.
Count Five of the LR Complaint and Count Eight of the Counterclaim in the LR Answer allege that (i) all of the conduct of Shawmut alleged in the other Counts to have been in breach of contract, fraudulent, economic duress, and wrongful interference with the relationship with Mechanics, and (ii) Shawmut's actions in seeking judicial remedies against LR as maker and LeFoll and GLeFoll as guarantors, taken together, were unfair or deceptive acts or practices in the conduct of Shawmut's business and, as such, were in violation of Connecticut General Statutes Section 42-110 (b) ("CUTPA").
To prevail on these claims, the LeFoll Parties had the burden of proving that Shawmut acted in manner which was immoral, unethical, oppressive, or unscrupulous. EconomicDevelopment Assoc. v. Citytrust, 3 Conn. L. Rptr. 403 (1991). To satisfy that burden they had to prove first that Shawmut did not have contractual rights to act as it did under the Note, the Shawmut Mortgage and the guarantees. Only if Shawmut did not have the contractual right to call a default when LR failed to pay interest due under the Note, to initiate an action in this Court to enforce against LeFoll and GLeFoll the obligations they had agreed to by their guarantees, and to foreclose under the Shawmut Mortgage, would it become necessary to consider whether Shawmut's actions (i) offended public policy as it has been established by statutes, common law or other established concept of fairness; (ii) was immoral, unethical, oppressive, or unscrupulous; and (iii) caused substantial injury to consumers. Economic DevelopmentAssoc v. Citytrust, 3 Conn. L. Rptr. 403 (1991).
For the reasons stated above in the Conclusions of Law relating to the other causes of action and defenses alleged by the LeFoll Parties, the LeFoll Parties have failed to satisfy their burden of proving that Shawmut did not have enforceable rights to enforce the Note, the Shawmut Mortgage and the guarantees in accordance with the terms of those documented contracts. LeFoll admitted execution and delivery of each of the contractual documents upon which Shawmut's actions were CT Page 6075 based. There was no evidence contradicting (i) the unimpeached testimony of Wamester that, notwithstanding whatever representation he had made concerning subordination, he believed that the Note and the Shawmut Mortgage were valid and enforceable in accordance with their terms, or (ii) Ripper's unimpeached testimony reaffirming the opinion he had given in 1989 that the Note, the Shawmut Mortgage and the guaranty given by LeFoll were valid and enforceable in accordance with their terms. Nor did the LeFoll Parties succeed in impeaching the testimony of Murphy and O'Brien that they believed the Note and the Shawmut Mortgage created rights that Shawmut was entitled to enforce.
In failing to prove that Shawmut did not have legally enforceable rights under the Note, the Shawmut Mortgage and the guarantees, the LeFoll Parties have failed to satisfy their burden of proving that Shawmut's actions (i) offended public policy as it has been established by statutes, common law or other established concept of fairness; (ii) was immoral, unethical, oppressive, or unscrupulous; and (iii) caused substantial injury to consumers.
Each of the LeFoll Parties' Special Defenses of alteration of contract and unclean hands is based on the premise that the conversations between LeFoll and Wamester prior to and at the Closing of the $500,000 Shawmut loan resulted in an enforceable agreement:
 (i) To prevail on their defense that Shawmut "has attempted to alter the principal contract between" the LeFoll Parties and Shawmut, the LeFoll Parties must first satisfy the same burden of proof that they have to prevail on their claim for breach of contract.
 (ii) Insofar as the LeFoll Parties' defense that Shawmut "comes before this court with unclean hands" is based on the allegation that Shawmut breached an implied covenant of good faith by its refusal to subordinate and by calling the alleged Note", to prevail on that defense the LeFoll Parties had the same burden of proving the existence of the contract to subordinate as they have on their claims that Shawmut breached an express contract to that effect and an obligation CT Page 6076 of good faith implied from such a contract.
Since the LeFoll Parties failed to satisfy their burden of proving the existence of an enforceable agreement by Shawmut to unconditionally subordinate the Shawmut Mortgage, they necessarily failed to satisfy their burden of proving the special defenses of alteration of contract and unclean hands each of which was premised on the existence of such an agreement.
LeFoll's admissions (i) that he signed and delivered the Note and the Shawmut Mortgage, and that he and his wife signed and delivered the Guarantees, and (ii) that LR failed and refused to pay interest due under the Note in April 1991, satisfied Shawmut's burden of proving the Note, LR's default thereunder, the right of Shawmut to recover reasonable attorneys' fees and collection costs in accordance with the terms of the Note, and the obligations of LeFoll and his wife under the Guarantees.
Shawmut was the original holder of the note and there was no evidence that it ever ceased to be holder of the note.
Although preserving its position that Shawmut is not entitled to recover anything in its foreclosure action, the LeFoll Parties stipulated that, if Shawmut is entitled to recover principal and interest under the Note, (i) the unpaid principal and accrued interest under the Note through January 13, 1995, at the pre-default rate specified in the Note, amounts to $654,895.82, (ii) the unpaid interest through January 13, 1995, at the default rate specified in the Note, amounts to an additional $37,138.89, and (iii) additional interest after January 13, 1995 accrues at the rate of 9.5 percent per annum at the basic rate, plus interest at the default rate of two percent per annum.
Shawmut is not precluded from recovering a judgment of foreclosure, or for a deficiency against LeFoll and his wife, because of a failure to introduce into evidence the original of the note and the guarantees that were signed and delivered at the June 30, 1989 closing. In addition LeFoll testified that he signed the original commercial promissory note, copy of which was exhibited to the witness during trial. Plaintiff's Exhibit 1. Transcript of January 25, 1995, pages 52 and 53, Le Foll also testified to signing the original of CT Page 6077 the guaranty agreement.
Although Shawmut did not introduce the original of either the Note or the Mortgage (or any other loan document for that matter) into evidence, it did introduce xerox copies of every one of the loan documents. LeFoll, who had executed the Note, the Mortgage, one of the personal guarantees and the collateral assignment of rents, who had supervised his wife's execution of her personal guaranty, and who had been present when each of the loan documents was delivered to Shawmut, admitted on the witness stand that the xerox copies introduced into evidence as full Exhibits appeared to conform to the originals. From the fact that Shawmut was able to offer xerox copies it is reasonable to infer that Shawmut is in possession of the originals from which the copies were made.
In addition, lest there be any question concerning the contents of the Mortgage for which the judgment of foreclosure is sought, Shawmut introduced into evidence, without objection and as a full Exhibit, a copy of the Mortgage certified as a true copy by the Clerk of the County in which the Mortgage had been recorded.
At no time did the LeFoll Parties object that the "best evidence" rule barred the introduction of these copies into evidence as full Exhibits without an adequate explanation of the absence of the originals. Accordingly, the copies may be considered as evidence equivalent to the originals.
If all of this evidence proving the making, contents and delivery to Shawmut of the Note, Mortgage and guarantees were not enough, the fact that the LeFoll Parties had executed the Note, Mortgage and guarantees, and had delivered them to Shawmut for consideration, were repeatedly asserted and admitted in the pleadings of the LeFoll Parties.
In any event, LeFoll's testimony (i) that he delivered the Note to Shawmut at the June 30, 1989 Closing, (ii) that he paid interest to Shawmut until April 1990, and then did not pay interest to anyone, and (iii) that until mid-July 1991 he tried to get Shawmut to subordinate the Mortgage that secured repayment of the Note, proves beyond question that Shawmut received possession of the Note when it was issued on June 30, 1989, and continued as holder of the Note at least until mid-July 1991. CT Page 6078
If the LeFoll Parties' pleadings and testimonial admissions were not enough to circumstantially prove the contents of the Note and Mortgage, delivery of the Note and Mortgage to Shawmut, and continuation of Shawmut's status as holder of the Note throughout all relevant times, the evidence that the LeFoll Parties introduced relating to the bank regulators specific concerns with the classification of this loan tends circumstantially, to prove that shortly before maturity Shawmut was still the holder of the Note, and had not transferred the Note.
It is a well-established principle of law that a condition once shown to exist is presumed to continue in existence "until the contrary is shown". Taintor v. Hartford,123 Conn. 515, 539 (1937). The presumption of continuance or continuity is one of fact and justifies the trier in making a certain inference without further testimony "unless and until met by evidence tending to rebut it . . . ." Ealahan v.Ealahan, 98 Conn. 176, 183-84 (1922).
Given the undisputed fact that Shawmut became the holder of the Note in June 1989, the presumption of continuance justifies the Court in making the inference that Shawmut continued to be the holder "unless and until met by evidence tending to rebut it."
The force of the presumption that Shawmut's status as holder continued from December 31, 1991, to the present is reinforced by the fact that, as a matter of law, no-one could become a holder in due course of the Note after December 31, 1991, because the Note became past due after that date. Conn. Gen. Stat. Sec. 42a-3-302(a)(2).
Not only does the LR Brief ignore the evidence tending to prove that Shawmut, and not anyone else, is the holder of the Note, but it misstates the relevant law. Connecticut General Statute Sec. 42a-3.309, cited at page 103 of the LR Brief, does not require a person seeking foreclosure of a mortgage to provide the Court with the original of either the mortgage or the note evidencing the debt secured thereby.
All that a party seeking a judgment of strict foreclosure need prove is (i) the amount of the unpaid debt secured by the mortgage, (ii) the fact that there has been a default under CT Page 6079 the terms of the debt or the mortgage, and (iii) the fact that the mortgagor does not have any equity remaining in the mortgaged property. All of these elements may be proved circumstantially, and the party seeking foreclosure is not required to offer the original of the Note or Mortgage where, as in the present Action, the amount of the unpaid debt is established by stipulation, and the terms of the debt and mortgage, and the fact of default are admitted.
Citing Connecticut Bank and Trust Company v. Wilcox,201 Conn. 570 (1986), the LR Brief argues that Shawmut may not recover against LeFoll and his wife because it did not introduce into evidence the original of the personal guarantees that LeFoll admitted on the witness stand were signed and delivered.
This argument is subject to the same fatal flaw as the LeFoll Parties' argument that Shawmut is not entitled to foreclose the Mortgage because it did not introduce into evidence the original of the Note that LeFoll admitted signing. In each case, a xerox copy that LeFoll admitted conformed to the original was admitted into evidence without objection. In each case, the pleadings of the LeFoll Parties admitted the execution and delivery of the originals, and based claims on the existence of the originals.
These stipulations satisfied Shawmut's burden of proving the amount to which it is entitled by reason of LR's default under the Note.
The testimony of Shawmut's appraiser and his written appraisal report established that the Colchester Property as of February 10, 1995 was $200,000, and satisfied Shawmut's burden of proof that there is no equity in the Colchester Property and Shawmut is therefore entitled to a judgment of strict foreclosure.
BY WAY OF RECAPITULATION
LeFoll's claims must, of necessity, stand or fall in large measure on what agreement, if any, was reached between LeFoll and Wamester. The court was impressed with Wamester's candor and forthright posture.
Although the discussions between LeFoll and Wamester CT Page 6080 looked toward the possibility of subordination of the bank's first mortgage on the Colchester property it was never envisioned nor did Wamester ever understand or agree to an absolute, unconditional subordination whenever LeFoll might ask for it.
Wamester never contemplated nor agreed to a course of conduct that would leave the bank in an unsecured position or to lessen or shrink the bank's existing security which was already weak. (A $500,000 mortgage on a parcel of land purchased for $310,000 with no structures thereon.)
While Wamester and LeFoll had a good and friendly relationship, Wamester never intended to abdicate his responsibility to his employer, the bank, by making any agreement that would impair or prejudice the bank's position.
Undoubtedly, Wamester was willing to work with LeFoll to help LeFoll achieve his desired end result. But never at the expense of prejudicing the security on which the bank relied.
Wamester never intended nor do his actions suggest that there was ever any indication that the bank expected anything less than compliance with the integrated loan documents and full and faithful repayment of the loan plus interest.
LeFoll's actions in ceasing to make the mortgage payments were not justified.
Wamester testified on February 8, 1995, during the trial, and the transcript reflects, ". . . no banker puts a loan on the books that he knows is not going to be paid back", page 14; and again, "The note is still an obligation," page 14; and again, "I don't ever recall writing any kind of a mortgage that says it is unenforceable if something and something doesn't happen." Page 15.
Although Wamester testified on February 7, 1995, "and I did agree with him to him that unconditionally that we would subordinate the first mortgage," his subsequent responses on cross examination reveal that, in fact, no specific terms or conditions were ever discussed or agreed upon and the issue was left entirely open.
The LR Brief makes clear that the LeFoll Parties plead CT Page 6081 claims that are based on an oral agreement. However, the LR Brief would have the Court rule that enforcement of this alleged agreement was not barred by Connecticut General Statutes Sec. 52-550 because (i) Connecticut General Statutes Sec. 49-31c applies, and (ii) the October 26 Letter was a sufficient memorandum signed by Shawmut evidencing the earlier oral agreement.
The first of these contentions ignores the fact that Section 49-31c by its terms applies only where a written agreement to subordinate has been proved, but is incomplete insofar as it fails to contain any of the terms of the future mortgage to which the agreement to subordinate relates. In the present case, the defect in the claim of the LeFoll Parties is not merely that the terms of the future mortgage were not contained in the writing by which the agreement to subordinate was memorialized. The defect is that there is no writing memorializing the agreement to subordinate. Accordingly, Section 49-31c does not defeat Shawmut's special defense to the claims based on the oral agreement.
According to the LeFoll Parties, the oral agreement upon which all of their claims are based was a simple agreement to unconditionally subordinate the Mortgage to a construction/permanent mortgage, whenever LeFoll might request such a subordination. The October 26 Letter, reasonably construed to give meaning to all of its provisions, memorializes an agreement that is materially different from the alleged oral agreement. Accordingly, that letter is no a memorandum sufficient to prove the agreement upon which the LeFoll Parties based their claims, and does not take the oral agreement out of the Statute of Frauds.
As to the issue of attorneys' fees, which are provided for in the terms of the commercial promissory note, the court makes the following observations.
Counsel for the plaintiff foreclosing bank have submitted a sixteen page itemized statement claiming the following attorneys' fees and costs.
1. Fees and costs for the law firm initially representing the Bank. Legal services $48,552.00. Costs $420.60. CT Page 6082
2. Fees and costs for the present counsel $259,795.23. Costs $5,559.87.
A supplemental affidavit by the plaintiff Banks' present counsel claims an additional $25,748.00.
The affidavits as to attorneys' fees appear to comply with the requirements outlined in St. Margaret McTernanSchool, Inc. v. Thompson, 8 CSCR 981, Pittman, J., as the affidavits include detailed time records, identity of dates, staff or attorneys' names, billing rate, type of task and length of time for work expended throughout the litigation plus copies of invoices already paid. The affidavits are very comprehensive.
The court has also endeavored to evaluate the complexity of the issues and the skill with which counsel has dealt with these issues. Miller v. Kirshner, 225 Conn. 185 (1993)621 A.2d 1326.
Judgment of Strict Foreclosure may enter in favor of Shawmut Bank Connecticut, N.A., F/K/A The Connecticut National Bank in the foreclosure action against LR Realty and the guarantors Le Foll, et ux.
The debt is found to be principal and interest through January 13, 1995, the sum of $654,895.82, unpaid interest at the default rate an additional $37,138.89 through January 13, 1995. Additional interest accrues at the rate of 9.5 percent per annum at the basic rate plus interest at the default rate of 2 percent per annum.
The court allows the fee of the appraiser, Hickey, in the amount of $2,600.00.
Attorneys' fees in the amount of $160,000.00 are allowed.
The defendants in the foreclosure action have not proved the allegations contained in their Second Amended Counterclaim and Set Off and the court finds in favor of the plaintiff Bank.
Judgment may enter in favor of the defendant Shawmut Bank Connecticut, N.A., F/K/A The Connecticut National Bank in the Lender Liability Action in that the plaintiffs in that action CT Page 6083 have not proved the allegations set forth in their amended complaint.
Austin, J.